UNITED STATE DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DUDLEY P. GILBERT,

                            Plaintiff,                    **BENNETT DECLARATION**

        -vs-                               **Docket No: 07-CV-0743 (WMS)**

NEW YORK STATE POLICE and WAYNE E.
BENNETT, INDIVIDUALLY AND AS PAST
SUPERINTENDENT OF THE NEW YORK
STATE POLICE,

                            Defendants.
_____

       **WAYNE E. BENNETT,** declares under penalty of perjury, pursuant to 28 U.S.C. §1746,

that the following is true and correct:

1.      I am currently employed as the Public Safety Commissioner, for the City of Schenectady,

       and have been since May 7, 2007.  From September 16th of 2003 to May 7, 2007, I was

       the Superintendent of the Division of State Police, for the State of New York ("NYSP" or

       "Division").  I started my career at the NYSP as a Trooper in 1968.  I eventually rose

       through the ranks to become Sergeant, Lieutenant, Captain, Major, Inspector, Assistant

       Deputy Superintendent, 1st Deputy Superintendent, and finally Superintendent.

2.      The Superintendent reports directly to the Governor and advises him as to public security

       and emergency issues.  He is also responsible for implementing the mission of the NYSP

       as outlined in the New York Executive Law and the instructions of the Governor.  The

       Superintendent supervises a force of five thousand sworn officers and one thousand

       civilian employees.  All final decisions for hiring and firing rest solely with the

       Superintendent.

3.      To aid in the execution of my duties, I had several Assistant Deputy Superintendents, as well as a First Deputy Superintendent.  The First Deputy Superintendent would carry out any duties assigned to him by the Superintendent, and execute the duties of the Superintendent in my absence.  While I was Superintendent, my First Deputy Superintendent was Preston L. Felton.

4.      I am advised that the plaintiff in this matter alleges that I terminated his employment with the NYSP based upon his race.  Nothing could be further from the truth and I vehemently deny this accusation.  The plaintiff was terminated for violating his probation, which followed his being found driving while intoxicated.  His case was handled in the normal procedure for discipline of Troopers in the NYSP, and the plaintiff was treated no differently then any other employee of the NYSP.

5.      Sworn members of the NYSP are not subject to New York's civil service laws, but they do have certain statutory and regulatory job protection.  The process for disciplinary action within the State Police is determined by New York Executive Law § 215 (3) and New York Regulations 9 NYCRR § 479, *et. seq.*   When first appointed to the NYSP, a member is subject to a probationary period of a year and a half.  During this period, members may be terminated for any reason, without a hearing.  For a member who is no longer on probation, the general disciplinary process is as follows.

6.      When a complaint is made against a member of the NYSP, the complaint is first sent to NYSP Internal Affairs, by a supervisor in the field.  An individual would then be assigned to investigate the complaint.  This could either be someone from Internal Affairs, or someone "in the field", who would be appointed by the member's supervising Major.  The individual investigating is required be at least one rank higher then the

member being investigated.

7.      Every week I, as Superintendent, received a report from Internal Affairs providing a
synopsis of all new complaints regarding NYPS members, called a "Complaint of
Personnel Investigation", providing the date, time, and location, as well as the nature and
the subject of the complaint.  While I was Superintendent, there were approximately eight
hundred complaints made in a year, all of which needed to be investigated.  If I felt the
complaint was of a serious nature, I would ask for additional updates on the investigation,
however, in most cases, the next time I would hear of the investigation would be when
the investigation was completed.

8.      In more serious cases, the member would be suspended, pending the results of the
investigation, which only the Superintendent could authorize.  Pursuant to NYSP
regulations, a member could be suspended without pay for up to thirty days, pending a
hearing.  While I would be involved in any decision to suspend a member without pay,
First Deputy Superintendent Felton would normally implement this decision.

9.      Once an investigation was completed, the results were reviewed by the Chief Inspector in
charge of Internal Affairs, to determine whether there was reasonable cause to believe the
member had violated NYSP rules and regulations, and, if so, whether punishment should
be determined at Division Head Quarters, or at the Troop level.  If the complaint was
determined to be handled at the Troop level, it would be referred to the Major in
command of the member's Troop.

10.     If the complaint was referred to Division Headquarters, it would generally be handled
initially by the First Deputy, who would work with the Division's Office of Counsel in
drafting charges or an offer of discipline to settle the case without a hearing.  If charges

were drafted, I would sign them.  I would not normally review the proof, but would only be verbally informed of the nature of the accusation.  It should be noted that decisions on whether to terminate a member were never delegated to the First Deputy, and I made every decision regarding this ultimate penalty.

11.    It should also be noted that in many instances the member's union would already have been involved in attempting to negotiate a resolution, prior to charges being filed.  These negotiations would often bear fruit, and discipline would be imposed with the consent of the member and the union, and without the need for formal charges being filed.

12.    If there was no resolution, the charges would be sent to the member.  The member would have the choice of accepting a penalty imposed by the Superintendent or requesting a formal hearing on the matter.  A hearing on the charges would be held by a hearing board.  The hearing board consists of three people, two appointed by the Superintendent and one by the member and his or her union.  All must be sworn members of the NYSP.

13.    One form a discipline which can result from this process would be a return to a probationary period.  When a member is placed on probation as a part of discipline, his probationary status is the same as that of a new hire, and he can be terminated without a hearing for violating probation.

14.    Upon assuming the position of Superintendent, I made it clear to the command structure of the NYSP, as well as to the unions representing Division employees, that if a member was returned to probationary status as form of disciplinary action, and then found to have violated the terms of their probation or NYSP rules and regulations, termination would be the most likely outcome.  As discussed above, I retained to myself the sole authority to terminate a member.

15.     With regard to the plaintiff, Dudley Gilbert, he was the subject of a prior investigation for driving while intoxicated, following an investigation of a motor vehicle accident by the Buffalo Police Department on November 9, 2004.  Following this investigation, the plaintiff was informed by First Deputy Superintendent Felton that there was reasonable cause to believe that he had violated the Regulations of the State Police, including Regulations 8A8, as well as the New York Vehicle and Traffic Law.

16.     The plaintiff was offered the choice of accepting a penalty of being suspended without pay for fifteen days, returned to probationary status for six months, and formally censured, or requesting a formal hearing on the matter.

17.     The plaintiff accepted the penalty, and waived his right to a hearing.  He was formally censured, suspended without pay for fifteen days, and returned to probationary status for six months, starting on February 1, 2005, and ending August 1, 2005.

18.     I do not recall being personally involved in that decision.

19.     I recall in the spring of 2005 being informed by the First Deputy that the plaintiff had been arrested for Driving While Intoxicated.  When that was brought to my attention, I was also made aware that the plaintiff was on probation as discussed above.

20.     At that time the decision was made to suspend the plaintiff without pay, due to the serious nature of the complaint, and the fact that he was on probation for a previous drinking and driving offense.

21.     I also recall that at some point the First Deputy and I discussed that the plaintiff was working with Inv. Bernard J. Feldmann of the NYSP Employee Assistant Plan ("EAP") and might receive alcohol counseling.  It should be noted that EAP and disciplinary proceedings are not related and are two separate and distinct things.  EAP is a program to

help employees with various stressors in their lives, including domestic issues, financial problems, mental health concerns, and alcohol and substance abuse. This program is especially important for NYSP members, given the stresses encountered by police officers on a daily basis. Ideally EAP should help members avoid situations where they could be subject to discipline, but it is in no way connected to the disciplinary process.

22.   When we discussed the plaintiff's participation in EAP, I may have said that I would consider the plaintiff's participation in alcohol counseling when determining the appropriate disciplinary action, in the same way that I would consider any members' mitigating conduct.

23.   When the investigative report regarding the plaintiff was finished, I was briefed on the results by Chief Inspector Colonel Joseph Loszynski. I am not sure whether I reviewed the investigative report, and do not recall doing so.

24.   I recall that it was determined that the plaintiff was found by two Officers and one Supervisor of the Buffalo Police to be driving while he was intoxicated; that he refused to take a chemical test to determine his blood alcohol; that members of the NYSP who interviewed him following the arrest believed he was intoxicated; and that he was observed to have urinated upon himself.

25.   In light of the fact that the plaintiff was on probation for a previous alcohol related offense and was found to be driving while he was intoxicated, I felt it was clear that the plaintiff had failed to address the issue which got him into trouble in the first place. I was also aware that the plaintiff had other prior disciplinary infractions, some of which also involved the use of alcoholic beverages.

26.   I am informed that the plaintiff has asserted that there was some kind of agreement

between First Deputy Superintendent Felton and Inv. Feldmann, that the plaintiff would not be terminated if he enrolled in an alcohol counseling program.

27.   I do not believe this for several reasons.  Initially, the First Deputy did not tell me of any such "agreement" although I did, as discussed above, say that I might consider the plaintiff's entering counseling.  In any event, as discussed above, the First Deputy did not have the authority to make such a commitment.  The decision on termination rested solely with me.

28.   My recollection is that during my tenure as Superintendent, in every instance where a member was found to have violated the terms of their probation or NYSP rules and regulations, after having been returned to probationary status, that member was terminated.  However, there may have been instances where a member was facing termination, and instead resigned or retired.  This is especially likely to occur if a member has been with the Division in excess of twenty years, and is therefore able to retire on full pension.  There is no way for the Superintendent or the NYSP to prevent a member from resigning, or retiring prior to disciplinary action being imposed.

29.   I am not aware of any member of the NYSP, who, during my tenure as Superintendent, was found to have been driving while intoxicated not once but twice, and the second time while on probation, who was not terminated or resigned or retired prior to termination.

30.   I am informed that the plaintiff was eventually acquitted of the criminal charges of Driving While Intoxicated.  This result does not change my opinion that the plaintiff deserved to be terminated.  My determination was based upon eyewitness observations of members of the Buffalo Police Department and a supervisor of the State Police at the time of the latest incident that was the basis of his dismissal from employment.

31.     The NYSP holds its members to a very high standard.  The NYSP are considered to be a "cut above" other police forces, and it is my opinion that police officers should be held to a higher standard than the guilty beyond a reasonable doubt standard applicable in criminal cases.  Because the plaintiff had been involved in not one, but two, driving while intoxicated incidents, the second of which took place while he was on probation for the first, it was clear to me that he would not or could not hold himself up to the standard for a New York State Trooper.  I therefore made the decision to terminate him, pursuant to Executive Law § 215 (3).

32.     The NYSP takes Driving While Intoxicated very seriously.  The NYSP makes twenty-five percent of the arrests for Driving While Intoxicated in the State of New York.  One of the NYSP's major initiatives is to improve the safety of New York's road ways, and I consider the prevention of drunk drivers, and the apprehension of those who do drive while intoxicated, to be one of its primary duties.  Much time and money is spent by the NYSP in pursuit of this goal and it is especially important that its own members do not bring discredit upon the NYSP by operating a motor vehicle while legally intoxicated.

33.     By letter dated June 10, 2005 I notified the plaintiff that he was being terminated as a member of the New York State Police.

34.     The decision to terminate Dudley Gilbert was based solely on his conduct, including the fact that he was unable, while on probation, to address the very conduct which caused him to be placed on probation.  I have never in my career based any hiring or termination decision on a person's race.

DATED:          December _4_, 2009

                                            _____/s/ Wayne E. Bennett_____
                                               WAYNE E. BENNETT